Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| **EL PUEBLO DE PUERTO RICO**<br><br>Apelado<br><br>v.<br><br>**LUIS ALFREDO GALAY SIERRA**<br><br>Apelante | TA2025AP00135 | ***APELACIÓN***<br>procedente del Tribunal de Primera Instancia Sala Superior de **Bayamón**<br><br>Casos Números:<br>D VI2024G0020,<br>D LA2024G0380<br>Y D LA2024G0394<br><br>Sobre:<br>**ART. 93.A 1ER. GRADO DEL C.P. Y OTROS** |

Panel integrado por su presidenta, la Juez Domínguez Irizarry, el Juez Ronda del Toro y el Juez Pérez Ocasio

Pérez Ocasio, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 18 de mayo de 2026.

Comparece ante nos, Luis Galay Sierra, en adelante, Galay Sierra o apelante, solicitando que revisemos la *"Sentencia"* del Tribunal de Primera Instancia, Sala Superior de Bayamón, en adelante, TPI-Bayamón, recaída en su contra el 16 de junio de 2023. El apelado fue declarado culpable por Tribunal de Derecho por el delito de Asesinato en Primer Grado y Ley de Armas.

Por los fundamentos que expondremos a continuación, ***confirmamos*** el dictamen apelado.

**I.**

Por hechos acaecidos el 26 de mayo de 2024 en Barrio Maguayo del Municipio de Dorado,[1] el 28 de mayo de 2024 se radicaron cargos *en ausencia* contra Galay Sierra por los delitos de Asesinato en Primer Grado y tres (3) imputaciones de Tentativa de

---

[1] Los hechos esbozados en la primera parte de esta sentencia son extraídos de los autos originales recibidos el día 19 de agosto de 2025.

Asesinato en Primer Grado;[2] Portación, Transportación o Uso de Armas de Fuego sin Licencia y Disparar o Apuntar Armas de Fuego;[3] y Maltrato Mediante Amenaza en concepto de Violencia Doméstica.[4] A este se le impuso una fianza de cuatro (4) millones de dólares. Habiéndose encontrado Causa para Arresto, el 18 de junio de 2024, Galay Sierra fue finalmente arrestado.

El 6 de septiembre de 2024, el Ministerio Público solicitó el archivo de uno de los cargos de Tentativa de Asesinato en Primer Grado. Pocos días después, siendo el 17 de septiembre de 2024, se celebró la Vista Preliminar, en la que sólo se encontró Causa para Acusar por los delitos de Asesinato en Primer Grado y Disparar o Apuntar Armas de Fuego. El 24 de septiembre de 2024 se celebró la Lectura de Acusación. No obstante, el Ministerio Público solicitó una Vista Preliminar en Alzada por los cargos desestimados.

Así las cosas, y luego de varios incidentes procesales, incluyendo el descubrimiento de prueba, el apelado enfrentó tres cargos: Asesinato en Primer Grado y los dos (2) cargos originalmente imputados al amparo de la Ley de Armas de Puerto Rico de 2020, *supra*. El 12 de diciembre de 2024, Galay Sierra renunció al Juicio por Jurado, celebrándose el mismo por *Tribunal de Derecho*, los días 15, 17 y 27 de enero de 2025; 24, 25 y 26 de febrero de 2025; y el 4 y 6 de marzo de 2025. Durante el Juicio, declararon los testigos, cuyos testimonios reseñamos a continuación, en el siguiente orden:

**Zoraida Morales**

La testigo es la madre de Carlos Javier Colón Morales, en adelante, Colón Morales, víctima fallecida en el incidente del 28 de mayo de 2024. Su testimonio se limitó a explicar qué hacía cuando

---

[2] Artículo 93(a) Código Penal de Puerto Rico de 2012, Ley Núm. 146-2012, 33 LPRA sec. 5141.
[3] Artículos 6.05 y 6.14 de la Ley de Armas de Puerto Rico de 2020, Ley Núm. 168-2019, 25 LPRA secs. 466d y 466m.
[4] Artículo 3.3 de la Ley para la Prevención e Intervención con la Violencia Doméstica, Ley Número 54 de 15 de agosto de 1989, 8 LPRA sec. 633.

recibió la llamada de lo sucedido, y lo que ocurrió cuando llegó al hospital. Indicó que los médicos del hospital le informaron que, aunque su hijo llegó con vida al mismo, falleció más tarde. Observó, además, a Desirée Gutiérrez González, en adelante, Desirée Gutiérrez, quien era la pareja de Colón Morales, quien se encontraba allí, visiblemente afectada.[5]

### Agente Benjamín Santiago Morales

El agente ha estado en servicio de la Policía de Puerto Rico por veinte (20) años.[6] El 26 de mayo de 2024 se encontraba patrullando en vehículo rotulado a través el Municipio de Dorado, durante el turno de 12:00m a 8:00pm.[7] Indicó que a eso de las 5:00pm recibió una nota del Sistema de Emergencias 911 sobre un herido de bala cerca del negocio llamado "El Puente Bar" y un parque de pelota.[8] Al llegar al lugar descrito, estableció un perímetro para custodiar la evidencia.[9] Explicó que allí observó unos casquillos de bala y un vehículo de motor dentro del perímetro.[10] Ofreció, además, que durante las 5:35pm-5:40pm, cuando llegó a la escena, el día estaba soleado.[11] Según este, allí se encontraban más de cien (100) personas.[12] También describió que en el lugar había un vehículo marca Toyota Cross frente al negocio aludido, con impactos de bala, y su conductora, que identificó como Carmen Serrano Figueroa, y la amiga de esta, que se encontraban heridas.[13] Más adelante, llegó el Agente Molina de la División de Homicidios.[14]

---

[5] Con el audio del testimonio de esta testigo hubo problemas, por lo que el 14 de enero de 2026 ordenamos a las partes a presentar una Exposición Narrativa respecto el mismo. El 2 de febrero de 2026 el apelante cumplió con la presentación de una Exposición Narrativa sobre el testimonio de Iván Vázquez, y el Procurador General de Puerto Rico, quien comparece en representación del Ministerio Público, la estipuló.
[6] Transcripción de la prueba oral, pág. 22.
[7] *Íd.*
[8] *Íd.*, pág. 24.
[9] *Íd.*, pág. 25.
[10] *Íd.*, pág. 26.
[11] *Íd.*, pág. 27.
[12] *Íd.*, pág. 28.
[13] *Íd.*, págs. 30 y 32.
[14] *Íd.*, pág. 29.

El testigo explicó que recopiló aproximadamente nueve (9) casquillos de bala calibre cuarenta y cinco (45) milímetros y cuatro (4) casquillos de bala nueve (9) milímetros.[15] Indicó que documentó los sucesos en sus notas.[16] Explicó que continuaron llegando llamadas informando que habían otros heridos de bala, que habían sido trasladados a distintos hospitales.[17]

Más adelante, llegó la Fiscal y el Instituto de Ciencias Forenses, en adelante, ICF, quienes se quedaron trabajando la escena hasta pasada la medianoche.[18] Luego, se trasladaron al Hospital Orlando Health de Dorado.[19] Cuando llegaron allí, se encontraron con un joven muerto, a quien describió como trigueño, entre 5'7 o 5'9 de altura y de unas ciento cincuenta (150) libras.[20] Las heridas de bala de este se encontraban en sus piernas y testículos.[21] Allí también se encontraba la pareja del occiso.[22]

El Agente testificó que se preparó un Informe Preliminar de Incidente que recoge sus notas.[23] También aceptó que no le consta de propio y personal conocimiento cómo llegó el fenecido al hospital.[24]

### Agente Morales

El Agente ha pertenecido a la Policía de Puerto Rico hace veinte (20) años, y al momento de los hechos, se encontraba adscrito al Distrito de Dorado.[25] Indicó que fue el agente custodio de la escena, y que se tuvieron que cerrar dos (2) avenidas frente a El Puente Bar, por la cantidad de personas que allí se encontraba.[26] Testificó que en la escena de los hechos vio casquillos de bala en el

---

[15] Transcripción de la prueba oral, pág. 30.
[16] *Íd.*, pág. 32.
[17] *Íd.*, pág. 30.
[18] *Íd.*, pág. 31.
[19] *Íd.*, pág. 32.
[20] *Íd.*
[21] *Íd.*, pág. 33.
[22] *Íd.*
[23] *Íd.*, pág. 34.
[24] *Íd.*, pág, 35.
[25] *Íd.*, pág. 61.
[26] *Íd.*, págs. 64-68.

suelo del estacionamiento.[27] Además, señaló que los funcionarios del ICF se demoraron unos cuarenta y cinco (45) minutos en llegar al lugar de los hechos.[28]

El testigo expresó que le solicitó a Carmen Serrano Figueroa que no moviera su vehículo hasta que no llegaran los agentes del Cuerpo de Investigaciones Criminales.[29] Añadió que no observó personas heridas o muertas allí. Posteriormente, le entregó la escena al Agente Ricardo Prats.[30] Finalmente, ofreció que más adelante se dirigió al hospital para asistir en la seguridad de sus compañeros.[31]

### Iván Vázquez Méndez[32]

El testigo indicó que tenía veintinueve (29) años de edad y cursa estudios para un bachillerato. Describió que, durante el día de los hechos, había una actividad del alcalde del Municipio de Dorado que estaba provocando mucha congestión vehicular en la zona. Indicó que se le acercaron unas personas en motoras y *fourtracks*, y una de estas le pidió que le prestara el carro. Este se negó, por lo que lo amenazaron con armas de fuego. Indicó que cerca, había una persona en el piso moviendo las piernas. Las personas que estaban con el individuo se acercaron al testigo y forcejearon con él. Eventualmente, este último accedió a llevar al herido al hospital. Montaron al herido en su vehículo, y además, describió a una mujer de pelo largo negro, que se montó también.

Testificó que, durante el camino la mujer lo apuraba. Sin embargo, al llegar a un semáforo, observó unas ambulancias, a las

---

[27] Transcripción de la prueba oral, pág. 69.
[28] *Íd.*, pág. 72.
[29] *Íd.*, pág. 75.
[30] *Íd.*, pág. 77.
[31] *Íd.*, pág. 81.
[32] Con el audio del testimonio de este testigo hubo problemas, por lo que el 12 de noviembre de 2025 ordenamos a las partes a presentar una Exposición Narrativa respecto el mismo. El 12 de diciembre de 2025 el apelante cumplió con la presentación de una Exposición Narrativa sobre el testimonio de Iván Vázquez, y el Procurador General de Puerto Rico, quien comparece en representación del Ministerio Público, y la estipuló.

cuales detuvo. Sostuvo que la muchacha, y el individuo que describió como alguien que agoniza, se fueron en la ambulancia.

Como parte de su contrainterrogatorio, el testigo explicó que él reportó los hechos a la policía, pero no recuerda con qué agente habló. Indicó que no tomó fotos ni videos, y tampoco apuntó tablillas. Describió al hombre que lo amenazó como una persona mayor, obesa y blanca y con camisa color negra. Explicó que hubo otro individuo, también mayor, obeso y de camisa roja.

### Agente Michael Camacho Badillo

El Agente investigador trabaja para la Policía de Puerto Rico hace trece (13) años.[33] El 3 de julio de 2024 recibió a la testigo Desirée Gutiérrez en horas de la mañana, quien fue en compañía del Agente Ricardo Molina de la División de Homicidios.[34] Indicó que Desirée Gutiérrez trajo un dispositivo con unos mensajes de la red social *Instagram*, para extraerlos.[35] El testigo le informó a esta el aspecto legal de ofrecer su consentimiento para ello.[36] Testificó que para la extracción manual se utilizó la computadora de la Policía, y para lo demás, se llevó el dispositivo a la División de Crímenes Cibernéticos.[37]

El Agente explicó que en el expediente del caso de epígrafe se guardaron, provenientes del dispositivo mencionado, imágenes, vídeos, registro de llamadas, conversaciones y archivos.[38] Se preparó un Informe Confidencial con lo extraído.[39] El testigo señaló la diferencia entre la extracción manual del dispositivo al análisis forense de su contenido.[40]

---

[33] Transcripción de la prueba oral, pág 89.
[34] *Íd.*, pág. 92.
[35] *Íd.*, pág. 93.
[36] *Íd.*, pág. 94.
[37] *Íd.*, págs. 95-98.
[38] *Íd.*, págs. 99-100.
[39] *Íd.*, pág. 109.
[40] *Íd.*, pág. 119.

**Agente Aníbal Ayala Arocho**

El testigo es Agente Investigador de Homicidios de la Policía de Puerto Rico en el Municipio de Vega Baja.[41] Durante el mes de julio del año 2023 tomó un adiestramiento de dos (2) días en la Academia de la Policía sobre extracciones de cámaras de vigilancia y evidencia digital, que finalizó con un examen práctico.[42] Tras esto, el TPI-Bayamón declaró al testigo como perito en extracción de imágenes de cámara DVR.[43]

Explicó que el 3 de julio de 2024, el Agente Ricardo Molina Fred le solicitó la extracción de unas imágenes en los monitores de seguridad de un supermercado – el cual indicó tenía aproximadamente una (1) hora de retraso.[44] Ofreció que esto obedece al agotamiento de batería, o la presencia de problemas con el servicio eléctrico.[45] El perito explicó los pasos llevados a cabo para la extracción de las imágenes que se buscaban.[46] Declaró que en las imágenes extraídas se desprende a la persona investigada "apuntando" desde un *fourtrack*.[47]

**Jerry Burgado Cortés**

El testigo es Investigador Forense del ICF hace veintitrés (23) años.[48] Testificó que, al llegar a la escena, estableció un perímetro, realizó una inspección visual y procedió a marcar las piezas de evidencia con conos y unos números. Además, fotografió la evidencia, la levantó y la marcó con sus iniciales, para luego ponerla en unos sobres y llevarla al ICF.[49] Relató que, en el lugar de los hechos del caso de marras, levantó dos (2) casquillos de bala nueve (9) milímetros.[50]

---

[41] Transcripción de la prueba oral, pág. 125.
[42] *Íd.*, págs. 126-127.
[43] *Íd.*, pág. 130.
[44] *Íd.*, pág. 131.
[45] *Íd.*, págs. 145-146.
[46] *Íd.*, pág. 146.
[47] *Íd.*, pág. 149.
[48] *Íd.*, pág. 156.
[49] *Íd.*, págs. 162-164.
[50] *Íd.*, pág. 168.

Por otro lado, en un informe, describió a Colón Morales como una persona de tez y cabello negro, midiendo 5'9" de altura, y pesando unas ciento sesenta (160) libras. Indicó que la fecha de nacimiento del fenecido fue el 5 de noviembre de 1994.[51] Según este, al occiso se le apreciaban cuatro (4) heridas. También expresó que al personarse al área de trauma del hospital en donde estaba el occiso, abrió el bulto de este y encontró una bala calibre cuarenta y cinco (45) milímetros.[52]

### Agente José Lasanta Rodríguez

El testigo trabaja hace diez (10) años para la División de Arrestos Especiales en Bayamón.[53] Testificó que el 18 de junio de 2024 diligenció una orden de arresto contra Galay Sierra.[54] Explicó que los cargos contra este fueron radicados *en ausencia*, luego de las gestiones infructuosas de citar al imputado.[55] El Agente indicó que, luego del arresto, el apelante fue llevado a la Comandancia de la Policía, donde fue fichado y prestó una declaración jurada luego de ser arrestado.[56] Según este, a las 8:00pm Galay Sierra fue trasladado al Tribunal.[57]

### Agente Ricardo Molina Fred

El testigo indicó que en marzo del año 2021 se convirtió en policía estatal, luego de fungir como policía municipal.[58] El Agente testificó que anteriormente ha fungido como investigador primario y secundario, en unas diez (10) ocasiones.[59]

Al momento de los hechos, laboraba en la División de Homicidios en Bayamón.[60] El 26 de mayo de 2024, se encontraba

---

[51] Transcripción de la prueba oral, pág. 174.
[52] *Íd.*, págs. 177-186.
[53] *Íd.*, pág. 201.
[54] *Íd.*, pág. 204.
[55] *Íd.*, pág. 215.
[56] *Íd.*, págs. 216-222.
[57] *Íd.*, pág. 229.
[58] *Íd.*, pág. 242.
[59] *Íd.*, pág. 246.
[60] *Íd.*, pág. 241.

en turno *on call* para cualquier escena de muerte violenta.[61] Explicó que los agentes del precinto que custodiaban la escena se comunicaron con el retén, quien a su vez, hizo contacto con el supervisor del CIC. Este último se puso en contacto con el testigo para advertirle de la escena.[62] Le instruyeron a incorporarse a la investigación de los hechos de marras, en el Barrio Maguayo del Municipio de Dorado.[63]

Explicó el testigo que, al arribar a la escena, era el Agente Benjamín Santiago quien custodiaba la escena. Este último le proveyó los datos para la investigación preliminar.[64] Describió que más tarde, llegaron los funcionarios del ICF al lugar de los hechos, quienes tomaron fotos, videos y prepararon croquis del lugar.[65] Además, el Agente describió los lugares de la escena en donde se observaron e identificaron casquillos de bala. Ofreció que allí había un vehículo de motor marca Toyota Cross, color blanco, con tres (3) orificios en la puerta posterior y una mancha de sangre.[66] El testigo expresó que las observaciones y hallazgos en la escena los documentó en sus notas.[67]

Testificó el Agente sobre los varios calibres de bala cuyos casquillos fueron recuperados en la escena – calibre 9x19, nueve (9) y cuarenta y cinco (45) milímetros.[68] Indicó que se levantaron muestras de sangre del vehículo Toyota Cross en la escena.[69]

Una vez concluyó sus quehaceres en la escena, se dirigió hacia el hospital en horas de la madrugada.[70] Estando allí, observó el cuerpo del occiso en una camilla con varias heridas en el cuerpo, específicamente en el área de la pierna, cadera, espalda y

---

[61] Transcripción de la prueba oral, pág. 244.
[62] *Íd.*, pág. 245.
[63] *Íd.*, pág. 247.
[64] *Íd.*, pág. 250.
[65] *Íd.*, pág. 252.
[66] *Íd.*, págs. 252-253.
[67] *Íd.*, pág. 254.
[68] *Íd.*, pág. 328.
[69] *Íd.*, pág. 330.
[70] *Íd.*, pág. 331.

testículos.[71] Ofreció que la persona que acompaño a la víctima al hospital fue Desirée Gutiérrez.[72]

Por otro lado, declaró que las cámaras de video en el negocio por donde ocurrieron los hechos no estaban funcionando.[73]

El 27 de mayo de 2024, entrevistó a la pareja del occiso, Desirée Gutiérrez, en el Cuartel de la Policía en el Municipio de Dorado.[74] Esta le indicó que se encontraba presente cuando ocurrieron los hechos. Según el Agente, la testigo declaró de manera coherente y tranquila que la persona que le disparó a la víctima fue su pareja anterior, Galay Sierra, a quien identificó en sala.[75] De la entrevista con la testigo, surgió que esta estuvo en una relación con el apelante durante (5) años y procrearon una hija.[76]

Según lo que le indicó Desirée Gutiérrez al Agente en su entrevista, esta y el occiso se conocieron en una fiesta en el mes de abril del año 2023, y en el mes de septiembre de ese mismo año, formalizaron una relación y vivían juntos.[77] Según esta, Galay Sierra no estaba a gusto con la relación de Desirée Gutiérrez y el fenecido, por lo que sucedieron incidentes entre los tres (3) previo a los hechos de epígrafe. Incluso, le indicó al agente que en el mes de diciembre del año 2023 la situación requirió una orden de protección contra el apelante.[78] Le añadió, además, que en durante enero del año 2024 Galay Sierra consiguió el número del occiso, y lo llamaba constantemente para amenazarlo.[79] Añadió que la llamaba a ella frecuentemente también.[80]

Ahora bien, según lo narrado al Agente por la testigo, el día antes de los hechos Galay Sierra se comunicó con esta para

---

[71] Transcripción de la prueba oral, pág. 332.
[72] *Íd.*, pág. 333.
[73] *Íd.*
[74] *Íd.*, pág. 344.
[75] *Íd.*, pág. 348.
[76] *Íd.*, pág. 353.
[77] *Íd.*, pág. 353.
[78] *Íd.*, pág. 354.
[79] *Íd.*, pág. 355.
[80] *Íd.*, pág. 356.

reclamarle que, a una actividad escolar de la hija que comparten, este no fue invitado pero su pareja, la víctima, sí.[81] Desirée Gutiérrez le indicó al Agente que el apelante le advirtió que habría consecuencias si la veía en la actividad política del próximo día.[82] Esta, sin embargo, llegó a la misma en su vehículo, y estando allí, se montó con la víctima en un *fourtrack*.[83] Esta le explicó que la caravana en la que estaban eventualmente llegó al lugar de los hechos.[84]

Por otro lado, el Agente testificó que como parte de sus labores investigativas del caso de autos, entrevistó a un joven que identificó como Iván.[85] Según el Agente, este le explicó que el día de los hechos, mientras se encontraba detenido en el tráfico del Municipio de Dorado, unos individuos intentaron quintarle el vehículo para llevar un herido al hospital. Luego de un enfrentamiento con estos, accedió con la condición de ser él quien llevara a la víctima. Le declaró, además, que con el occiso se montó en su vehículo una mujer que identificó como Desirée Gutiérrez. Le indicó, también, que para montar al herido, bajaron de su vehículo una sombrilla y un bulto. Conforme el testimonio del Agente, Iván le describió a este cómo Desirée le hablaba al occiso, y que cuando divisaron la ambulancia, la detuvieron para que llevara a la víctima al hospital.[86] El Agente indicó que el vehículo de motor de Iván era un Toyota Corolla color blanco. Según el testimonio del Agente, Iván entonces se movilizó al cuartel de la policía para notificar lo ocurrido.[87]

El Agente en cuestión testificó haber entrevistado a otras personas que resultaron heridas y a la dueña del vehículo Toyota

---

[81] Transcripción de la prueba oral, pág. 357.
[82] *Íd.*, pág. 359.
[83] *Íd.*, pág. 360.
[84] *Íd.*
[85] *Íd.*, pág. 361.
[86] *Íd.*, págs. 363-364.
[87] *Íd.*, pág. 365.

Cross.[88] Además, explicó que con la ayuda de Desirée Gutiérrez, este pudo identificar un supermercado de nombre Agranel en Dorado, que coloca en la ruta de los hechos. El 3 de junio de 2024 obtuvo el consentimiento del establecimiento para acceder a las cámaras de video del exterior, lo cual hizo con el Agente Aníbal Ayala.[89]

El Agente indicó que las imágenes captadas corroboraron el testimonio de Desirée sobre la ruta que el occiso y ella cursaron en la caravana, el día de los hechos. Añadió que también corroboró la vestimenta que llevaban Desirée Gutiérrez y el fenecido ese día. En sala, además, se presentó una imagen aérea del lugar de los hechos. Finalmente, de las imágenes se desprende que cuando el occiso llegó al área, Galay Sierra se encontraba recostado sobre una de las puertas del negocio.[90] El Agente describió que cuando este último los identifica, se acerca a estos, desenvaina de su cintura un arma de fuego que describió color crema, con las letras SUPREME en rojo, y comenzó a dispararles. Luego que el occiso cayó al suelo, el apelante continuó disparándole.[91]

Según el testimonio del Agente, luego de atacar al occiso, el apelante continuó disparando hacia el parque y el centro comunal del área. Observó que Galay Sierra corrió huyendo, y una persona le disparó a este. Describió que Desirée Gutiérrez comenzó a pedir ayuda, cuando apareció Iván.[92]

El Agente continuó describiendo el testimonio que le brindó Desirée Gutiérrez. Esta le indicó que una vez llegan con el occiso a sala de emergencia, lo atendió el doctor y personal médico, que al cabo de un tiempo, certificó su muerte.[93]

---

[88] Transcripción de la prueba oral, pág. 365.
[89] *Íd.*, págs. 367-370.
[90] *Íd.*, págs. 383-384.
[91] *Íd.*, págs. 383-384.
[92] *Íd.*, pág. 388.
[93] *Íd.*, pág. 392.

Luego de describir las entrevistas de Iván y Desirée Gutiérrez, el Agente testificó que el 28 de mayo de 2025 se radicaron los cargos en ausencia contra Galay Sierra, con su testimonio y la declaración jurada de Desirée Gutiérrez.[94] Añadió que 18 de junio de 2025, luego de ser arrestado, el apelante fue trasladado a la Comandancia de Bayamón, en donde se entrevistó. Explicó que le entregó el documento con las advertencias de ley, que el apelante las leyó, inició y firmó. Ofreció que, aunque Galay Sierra se miraba cansado, este tenía la capacidad de entender y explicar. Así, le tomó los datos personales y le preguntó si estaba arrepentido de lo ocurrido. Según el testimonio del Agente, Galay Sierra afirmó estar arrepentido.[95] Sin embargo, con relación a los particulares de los hechos acaecidos, este indicó no acordarse de ellos y no contestó más nada.[96]

El Agente expresó que luego del arresto del apelante, Desirée Gutiérrez se comunicó con él para indicarle que tenía unos mensajes de Galay Sierra posteriores al incidente. Explicó que se comunicaron con la División de Crímenes Cibernéticos, y con el consentimiento de esta, extrajeron sus mensajes y registro de llamadas. Indicó que se extrajeron mensajes del apelante de la plataforma *Instagram*, en los que le decía a Desirée Gutiérrez que la amaba a ella y sus hijas y se encontraba arrepentido por lo sucedido.[97]

El Agente testificó que recibió varias confidencias referentes al caso de autos, que fueron corroboradas por Desirée Gutiérrez, por lo que catalogó con gran importancia su testimonio. Razonó lo anterior, porque ella observó en la escena, y los videos rescatados corroboraron su testimonio.[98]

Añadió que las personas que montaron al occiso en el vehículo de Iván eran conocidos de Desirée Gutiérrez y la víctima. Esta última

---

[94] Transcripción de la prueba oral, pág. 393.
[95] *Íd.*, págs. 397-405.
[96] *Íd.,* pág. 405.
[97] *Íd,* págs. 410-411.
[98] *Íd.,* págs. 413-431.

le admitió que no sabía quién se había llevado el *fourtrack* en el que andaban, el cual era prestado.[99]

### Paola Luna García

La testigo es patóloga forense en el ICF desde el mes de julio del año 2023.[100] Indicó que, a lo largo de su carrera, ha realizado cuatrocientas ochenta y seis (486) autopsias convencionales y cuarenta y tres (43) autopsias virtuales.[101] Sin embargo, admitió que era su primera vez declarando ante el Tribunal.[102] El foro a quo la declaró perito en patología forense.[103]

Testificó que evaluó el cuerpo del occiso para determinar la causa y manera de muerte luego de realizada la autopsia. Esto lo realizó evaluando las fotos y pruebas ancilares.[104] La perito recibió el cuerpo del fenecido Colón Morales el 27 de mayo de 2024 del Orlando Health Center de Dorado, y realizó la autopsia el 29 de mayo de 2024. Según la testigo, *la muerte de este fue ocasionada por una herida de bala.*[105]

A consecución, preparó un Informe Forense sobre el occiso.[106] El mismo detalla que el occiso sufrió siete (7) traumas: cuatro (4) de estos fueron producto de las heridas de bala y tres (3) fueron producidos por un objeto contundente.[107]

### Eduardo Fonseca García[108]

El testigo trabajó en el ICF durante cinco (5) años. El último año y medio laboró como Examinador de Armas de Fuego. Indicó

---

[99] Transcripción de la prueba oral, págs. 467-488.
[100] *Íd.*, pág. 265.
[101] *Íd.*, pág. 268.
[102] *Íd.*, pág. 270.
[103] *Íd.*, pág. 271.
[104] *Íd.*, págs. 265-266.
[105] *Íd.*, pág. 275.
[106] *Íd.*, págs. 274-277.
[107] *Íd.*, págs. 278-279.
[108] Con el audio del testimonio de este testigo hubo problemas, por lo que el 12 de noviembre de 2025 ordenamos a las partes a presentar una Exposición Narrativa respecto el mismo. El 12 de diciembre de 2025 el apelante cumplió con la presentación de una Exposición Narrativa sobre el testimonio de Iván Vázquez, y el Procurador General de Puerto Rico, quien comparece en representación del Ministerio Público, y la estipuló.

que como parte de sus labores, analiza la evidencia científica que esté relacionada con armas de fuego, el funcionamiento de estas, realizar comparaciones y exámenes microscópicos sobre estas y las comparaciones de casquillos de bala. Durante su tiempo en el ICF, analizó más de ochenta (80) casos, y aproximadamente la mitad fueron asesinatos. No obstante, este fue el primer caso en el que testificó. El TPI-Bayamón lo admitió como perito.

El testigo declaró el proceso para custodiar y documentar evidencia en el ICF. Sobre el caso de epígrafe, testificó que la parte perjudicada, entre otros, fue Colón Morales. Recibió la evidencia pertinente al mismo, el 14 de noviembre de 2024, la cual fue sometida por el Agente Jerry Burgado. Indicó que este último le solicitó una comparación microscópica, un examen de casquillos, un examen de proyectiles y los derivados. Añadió que recibió nueve (9) casquillos calibre 45, dos (2) casquillos 9 por 19, y dos (2) casquillos 9 milímetros. Explicó que estos últimos dos (2) calibres son lo mismo. El perito explicó el proceso técnico, científico y tecnológico de la evaluación.

Según sus expresiones, cuando terminó sus evaluaciones, devolvió la evidencia el 27 de noviembre de 2024 a Félix Vázquez Solís, quien, a su vez, se la entregó a Abigail Torres. Esta última, depositó la evidencia con el Agente Ricardo Molina Fred.

Según su análisis, el testigo concluyó que los casquillos 9 milímetros y de calibre 45 fueron disparado por una misma arma de fuego. Es decir, que respecto al caso de autos, estuvieron, como menos, involucradas dos (2) armas de fuego.

**Desirée Gutiérrez González**

La testigo es madre y tiene dos (2) hijos. Explicó que el acusado es el padre de uno de estos. Testificó que conoce a Galay Sierra hace aproximadamente cinco (5) o seis (6) años. Explicó que

la víctima del caso era su pareja actual, por espacio de un año y medio.[109]

Esta describió la relación entre el occiso y el apelante. También declaró sobre cómo había sido la relación entre ella y Galay Sierra. Describiendo la misma, expresó que el apelante la amenazaba, le gritaba y humillaba verbalmente y a través de mensajes de texto, y las plataformas de *Whatsapp* e *Instagram*.[110] En el mes de febrero del año 2023 terminó su relación con el apelante, se fue a vivir a otro lugar y cortó comunicación con él.[111]

Ahora bien, en el mes de abril del año 2023 conoció a la víctima del caso y formalizó su relación con él unos meses más tarde. Indicó que convivía con este.[112] Explicó que el apelante quería continuar teniendo actividades familiares con la testigo y la hija que comparten, pero se empezó a negar por respeto a su nueva relación.[113] Narró que Galay Sierra se enteró que estaba conviviendo con el occiso porque la siguió en una ocasión hasta la residencia. Cuando este entró, comenzó a ocasionar daños a los muebles y objetos de la residencia. Por estos hechos, el TPI-Bayamón le concedió una Orden de Protección contra el apelante por un espacio de cuatro (4) meses.[114] Según Desirée Gutiérrez, las relaciones no mejoraron, aun después de este incidente. Indicó que Galay Sierra se personaba al lugar de empleo del occiso y lo llamaba al teléfono celular.[115]

La testigo explicó que, en el mes de mayo del año 2024, el apelante la llamó para reclamarle que lo haya excluido de las actividades escolares de sus hijas. Según Desirée Gutiérrez, este se dirigió a ella en un tono alto y molesto. Añadió que, durante la

---

[109] Transcripción de la prueba oral, págs. 518-519.
[110] *Íd.*, págs. 519-522.
[111] *Íd.*, pág. 524.
[112] *Íd.*, pág. 525.
[113] *Íd.*, pág. 526.
[114] *Íd.*, págs. 552-579.
[115] *Íd.*, págs. 579-602.

semana del 21 al 24 de mayo de 2024, Galay Sierra la llamó en unas treinta (30) ocasiones. Le contestó la primera llamada, y luego paró de coger sus llamadas.[116]

La testigo narró que en una conversación con el apelante, dialogaron sobre una caravana política que iba a ocurrir en el Municipio de Dorado.[117] Según ella, Galay Sierra le dijo que si la veía allí con su nueva pareja *"se iba a formar un revolú"*.[118] Además, le dijo que quería encontrarse con la víctima para *"resolver el problema que había entre ellos dos"*.[119] Explicó también que su pareja había escuchado la conversación, y este le manifestó que no sería parte de eso.[120] No obstante, esta le aconsejó a la víctima no ir a la caravana, pero este optó por ir. Ambos se encontraron en el negocio conocido como *El Almendro* de Dorado, donde compartieron y luego salieron en un *four track* hacia la caravana.[121]

Según la testigo, la caravana recorrió varios lugares del Municipio de Dorado, hasta que llegó al Barrio Maguayo, en donde se detuvieron frente al negocio *El Puente*. Esta narró que, cuando se acercaron a este negocio, se puso ansiosa por lo que le había comunicado Galay Sierra. Explicó que este frecuentaba este establecimiento. Por eso, una vez lo divisó, se lo indicó a su pareja.[122] Una vez el apelante los ve, se acercó rápidamente a ellos, por lo que no lo perdió de vista. Indicó que este se detuvo a unos diez (10) pies de donde estaban, sacó un arma de fuego del frente de su pantalón y disparó en dos (2) ocasiones. Indicó que sabía que era un arma, ya que la había visto anteriormente en casa del apelante. La describió de color crema, con letras rojas que leían *"Supreme"*.[123]

---

[116] Transcripción de la prueba oral, págs. 601-606.
[117] *Íd.*, pág. 610.
[118] *Íd.*
[119] *Íd.*, pág. 614.
[120] *Íd.*
[121] *Íd.*, págs. 618-620.
[122] *Íd.*, págs. 626-626.
[123] *Íd.*, págs. 631-634.

Desirée Gutiérrez explicó que, luego de recibir los disparos en su abdomen, el fenecido se bajó del *fourtrack*, intentó correr pero cayó al suelo. Ella expresó que corrió hacia donde la víctima, y lo cubrió con su cuerpo. Notó que Galay Sierra siguió disparando hacia el parque de pelota. La testigo, entonces, le solicitó al apelante que parara de disparar, por lo que este huyó corriendo del lugar. Añadió que, en defensa propia, el occiso le disparó al apelante, con un arma de fuego que tenía en una cartera.[124]

Luego de ocurridos los hechos, la testigo se dirigió a casa de su madre, llamó a las autoridades y luego se personó al Cuartel de la Policía del Municipio de Dorado. Estando allí, explicó lo sucedido, incluyendo el incidente cuando Galay Sierra llegó a casa del occiso y rompió los bienes muebles.[125] Testificó, además, que estando la víctima en el suelo herida, comenzó a solicitar ayuda de los vehículos que transitaban pero nadie los ayudó. Cuando divisaron un vehículo detenido, le pidieron ayuda y este se negó. Por ello, lo encañonaron y obligaron a montar al fenecido en la parte posterior de su vehículo, junto a la testigo. Ella expresó que estando en el vehículo, la víctima estaba desesperada, decía que tenía sed y no sentía sus piernas. Narró que de la mochila del conductor sacaron un enjuagador bucal, y Colón Morales bebió de eso.[126]

De camino al hospital, se cruzaron con una ambulancia, la cual detuvieron. Montaron al occiso en el mismo, y trataron de estabilizarlo en el lugar. Luego, lo transfieren al Doctor's Center de Dorado, en donde murió unos treinta (30) minutos luego de llegar. Al recibir la noticia del fallecimiento de su pareja, la testigo se desmayó y fue llevada a Sala de Emergencia, en donde fue atendida por el personal de enfermería.[127]

---

[124] Transcripción de la prueba oral, págs. 641-650.
[125] *Íd.*, págs. 658-659.
[126] *Íd.*, págs. 672-676.
[127] *Íd.*, págs. 676-679.

El 29 de mayo de 2024, Desirée Gutiérrez fue al Cuartel de la Policía a informar que Galay Sierra había sido la persona que le disparó a Colón Morales. Para ello, se entrevistó con el Agente Molina Fred.[128]

Posteriormente, el apelante le escribió a Desirée Gutiérrez a través de la plataforma digital de *Instagram*, con su nombre de usuario @w_87. En su mensaje, Galay Sierra le expresó que lo perdonara y que la amaría para siempre. Sobre ese mensaje, la testigo alertó al Agente Molina Fred. Así, se trasladaron al Municipio de Bayamón, para que los agentes con la pericia para ello allí – y con el consentimiento de ella – extrajeran ese mensaje de su celular.[129]

La Policía extrajo unas capturas de pantalla sobre el mensaje aludido, y el registro de llamadas. Explicó que, aunque el Agente Molina Fred no fue la persona que extrajo la información de su celular, este se encontraba con ella.[130]

A preguntas de la defensa, la testigo admitió que, en otra ocasión, había verbalizado que Colón Morales no estaba armado y no le había disparado al apelante.[131]

Sometida la prueba, y presentados los argumentos finales, el TPI-Ponce declaró a Galay Sierra culpable de todos los delitos por los cuales se le acusó. Señaló, por lo tanto, el 16 de junio de 2025 para la vista para dictar sentencia. Llegado el día pautado, el Foro Primario sentenció al apelante a un total de ciento treinta y cuatro (134) años de cárcel, en consideración al año y ocho (8) meses bonificados.

Inconforme con este pronunciamiento, Galay Sierra radicó ante esta Curia un *"Escrito de Apelación"* el 16 de julio de 2025. El 6 de agosto de 2025, emitimos una *"Resolución"* en la que

---

[128] Transcripción de la prueba oral, pág. 680.
[129] *Íd.*, págs. 681-682.
[130] *Íd.*, págs. 684-685.
[131] *Íd.*, pág. 725.

impartimos a las partes las instrucciones para la presentación y estipulación de la transcripción oral de los procedimientos.

Luego de una prórroga, el apelante presentó la transcripción solicitada el 22 de septiembre de 2025. La misma constó de ochocientas treinta y seis (836) páginas. Concedimos una prórroga al Procurador General para presentar sus enmiendas y objeciones a las mismas. Así, la parte recurrida cumplió con ello el 27 de octubre de 2025. Sin embargo, hubo unos problemas con el audio, y algunos testimonios no pudieron ser transcritos. Por ello, y a solicitud de parte, autorizamos la presentación de estos testimonios mediante exposición narrativa, las cuales recibimos los días 12 de diciembre de 2025 y el 6 de febrero de 2026.

Recibida y estipulada la prueba oral, Galay Sierra presentó su *"Alegato"* el 10 de marzo de 2026, en el que hizo los siguientes señalamientos de error:

**PRIMER ERROR:** Erró el Honorable Tribunal de Primera Instancia, Sala Superior de Bayamón, al encontrar culpable a la apelante cuando la prueba de cargo no estableció su culpabilidad más allá de duda razonable, en violación al derecho a la presunción de inocencia y el debido proceso de ley.

**SEGUNDO ERROR:** Erró el Honorable Tribunal de Primera Instancia, Sala Superior de Bayamón, al no permitir al apelante, por conducto de su representación legal, hacer preguntas sobre el contenido de un CD, admitido como exhibit por estipulación entre las partes, violando su derecho constitucional a presentar prueba a su favor y confrontar a los testigos con dicha prueba.

Por su parte, la recurrida presentó el *"Alegato de el Pueblo de Puerto Rico"* el día 10 de abril de 2026. Perfeccionado así el recurso de autos, y con el beneficio de la transcripción oral, procedemos a resolver.

## II.

### A. Apelación Criminal

En nuestro ordenamiento jurídico, toda persona acusada tiene *derecho a apelar* cualquier sentencia penal que recaiga en su contra. *Pueblo v. Torres Medina*, 211 DPR 950, 959 (2023). Como es sabido, las Reglas 193 y 194 de Procedimiento Criminal, 34 LPRA Ap. II, R. 193 y 194, disponen que una *apelación criminal* se formalizará con la presentación de un escrito ante un foro de mayor jerarquía. *Pueblo v. Arlequín Vélez*, 194 DPR 871, 876 (2016); *Pueblo v. Rodríguez Meléndez*, 150 DPR 519, 522 (2000). Es importante señalar que *la apelación* es un privilegio estatutario que adquirió un carácter cuasi-constitucional que forma parte del debido proceso de ley. *Pueblo v. Rivera Ortiz,* 209 DPR 402, 419 (2022); *Pueblo v. Valentín Rivera*, 197 DPR 636, 638 (2017); *Pueblo v. Esquilín Díaz,* 146 DPR 808, 815-816 (1998); *Pueblo v. Prieto Maysonet,* 103 DPR 102, 104 (1974).

Este Tribunal de Apelaciones, una vez adquirida la jurisdicción de la controversia, tiene el deber de resolver el recurso de apelación en sus méritos. *Pueblo v. Colón Canales*, 152 DPR 284, 291 (2000); Artículo 4.006(a) de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, Ley 201-2003, 4 LPRA sec. 24(y). Por ello, los tribunales apelativos poseemos la facultad de examinar cualquier error de derecho cometido por los tribunales de primera instancia, así como cualquier asunto de hecho y derecho. *Pueblo v. Rivera Ortiz, supra*, págs. 421-422; *Pueblo v. Irizarry,* 156 DPR 780, 788 (2002). Pues, como cuestión de derecho, la determinación de probar la culpabilidad de una persona más allá de duda razonable es revisable, dado que la apreciación de la prueba es un asunto tanto de hecho como de derecho. *Pueblo v. Irizarry,* supra; *Pueblo v. Torres Medina*, supra; *Pueblo v. Rivero Lugo y Almodóvar,* 121 DPR 454, 473 (1988); *Pueblo v. Pagán Díaz,* 111 DPR 608, 621 (1981).

Es norma hartamente conocida que el juzgador de los hechos está en mejor posición para apreciar y aquilatar la prueba presentada. *Pueblo v. Negrón Ramírez,* 213 DPR 895, 910-911 (2024); *Pueblo v. Casillas, Torres,* 190 DPR 398, 416 (2014). A esos efectos, la apreciación de la prueba del juzgador de los hechos merece gran respeto y deferencia por parte de un foro apelativo. *Id.* Así las cosas, los tribunales apelativos solamente intervendremos con la apreciación de la prueba cuando se demuestre existencia de *pasión, prejuicio, parcialidad o error manifiesto. Pueblo v. Casillas, Torres,* supra, pág. 417; *Pueblo v. Rivera Ortiz,* supra, pág. 422; *Pueblo v. Irizarry,* supra, págs. 788-789.

Cuando un acusado presenta un recurso de apelación en el que plantea como error insuficiencia de la prueba, así como errores de derecho, los foros apelativos realizaremos un escrutinio de dos (2) partes. *Pueblo v. Ortiz Colón,* 207 DPR 100, 125 (2021). En primer lugar, evaluaremos la alegación de insuficiencia de prueba que, de ser meritoria, procede absolver al acusado. *Id.* Ahora bien, si el reclamo de insuficiencia de la prueba resulta inmeritorio, procede atender los errores de derecho. *Id.*

**B. Quantum probatorio: más allá de duda razonable**

Nuestra Carta Magna, en su Artículo II, Sección 11, establece que los imputados o acusados de delito disfrutan de una presunción de inocencia. *Pueblo v. Negrón Ramírez,* supra, pág. 895; *Pueblo v. Toro Martínez,* 200 DPR 834, 855 (2018). Por eso, la Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R. 110, dispone que esta presunción deberá ser rebatida, probando lo contrario. El estándar probatorio para que el Estado logre establecer la culpabilidad de un imputado o acusado de delito es la "duda razonable". *Pueblo v. García Colón I,* supra, pág. 174; *Pueblo v. Ramos y Álvarez,* 122 DPR 287, 315-316 (1988). Es decir, se deberá probar su culpabilidad más

allá de toda duda razonable. Lo anterior, constituye uno de los imperativos más básicos y esenciales del debido proceso de ley. *Pueblo v. Irizarry*, supra, pág. 786. Cabe recalcar que este es el más riguroso estándar probatorio.

La duda razonable que justifica la absolución del acusado es "el resultado de la consideración serena, justa e imparcial de la totalidad de la evidencia del caso o de la falta de suficiente prueba en apoyo de la acusación." *Pueblo v. Irizarry*, supra, pág. 788. Es decir, la duda razonable no es otra cosa que "la insatisfacción de la conciencia del juzgador con la prueba presentada". *Id.*

Ahora bien, nuestro ordenamiento jurídico establece que un hecho puede establecerse mediante evidencia directa o circunstancial. Regla 110 de Evidencia, 32 LPRA Ap. VI, R. 110. La precitada Regla dispone, además, que la prueba *directa* es aquella "que prueba el hecho en controversia sin que medie inferencia o presunción alguna y que, de ser cierta, demuestra el hecho de modo concluyente". Por otro lado, la misma Regla establece que la prueba *circunstancial* "tiende a demostrar el hecho en controversia probando otro distinto, del cual por si o, en unión a otros hechos ya establecidos, puede razonablemente inferirse el hecho en controversia".

Con relación a la prueba testifical, tanto la precitada Regla, como nuestra jurisprudencia, ha sido clara en que aquel testimonio al que el juzgador le merezca entero crédito será suficiente para probar un hecho. *Id. Pueblo v. Chévere Heredia*, 130 DPR 1, 19-21 (1995). Es por esta deferencia a la credibilidad que otorgue el juzgador de los hechos a un testigo, que aun si se encontrara falsedad en parte sus declaraciones, no será necesario descartar el resto de su testimonio. *Pueblo v. Rodríguez Pagán*, 182 DPR 239, 260 (2011); *Pueblo v. Pagán Ortiz*, 130 DPR 470, 483 (1992).

Por otra parte, es norma reiterada que la apreciación que hace un juzgador de los hechos y de la prueba que desfila en el juicio es una cuestión mixta de hecho y de derecho. *Pueblo en interés del menor F.S.C.,* 128 DPR 931, 942 (1991). Por esto, la misma es revisable en apelación. *Id.* Por otro lado, tal apreciación incide sobre la suficiencia de la prueba, capaz de derrotar la presunción de inocencia, lo que puede convertir este asunto en uno de derecho.

Nuestro Tribunal Supremo ha enfatizado, en ocasiones repetidas, que la valoración y el peso que el juzgador de los hechos le imparte a la prueba y a los testimonios presentados ante sí *merecen respeto y confiabilidad* por parte de este Tribunal. *Pueblo v. Maisonave Rodríguez,* supra, pág. 62-63; *Pueblo v. Carrasquillo Carrasquillo,* 102 DPR 545, 551 (1974). Como corolario de lo anterior, *salvo que se demuestre la presencia de error manifiesto, pasión, prejuicio o parcialidad,* el foro apelativo no debe intervenir con la evaluación de la prueba hecha por el juzgador de hechos. *Pueblo v. Toro Martínez,* supra, pág. 858; *Pueblo v. Acevedo Estrada,* supra, págs. 98-99; *Pueblo v. Rodríguez Román,* supra, pág. 129.

No obstante, el foro apelativo podrá intervenir con tal apreciación cuando de una evaluación minuciosa surjan "serias dudas, razonables y fundadas, sobre la culpabilidad del acusado". *Pueblo v. Carrasquillo Carrasquillo,* supra, pág. 551. Ante la inconformidad que crea la duda razonable, los tribunales apelativos, aunque no están en la misma posición de apreciar la credibilidad de los testigos, sí tienen, al igual que el Foro Apelado, "no sólo el derecho [,] sino el deber de tener la conciencia tranquila y libre de preocupación". *Pueblo v. Irizarry,* supra, pág. 790. Véase, además, *Pueblo v. Carrasquillo Carrasquillo,* supra, pág. 552.

Por ende, el Foro Primario está en mejor posición para aquilatar la prueba testifical que ante sí se presenta, ya que es quien tiene ante sí a los testigos cuando declaran. *Barreto Nieves et al. v.*

*East Coast,* 213 DPR 852, 889 (2024); *Pueblo v. Negrón Ramírez,* supra, pág. 910; *E.L.A. v. P.M.C.,* 163 DPR 478, 490 (2004); *Argüello v. Argüello,* 155 DPR 62, 79 (2001). El juzgador de los hechos es quien goza del privilegio al poder apreciar el comportamiento del testigo, o el 'demeanor', lo que le permite determinar si le merece credibilidad o no. Este es quien tiene la oportunidad de verlos y observar su manera de declarar, apreciar sus gestos, titubeos, contradicciones, manerismos, dudas y vacilaciones. *Pueblo v. Cruz Rosario,* 204 DPR 1040, 1057-1058 (2020); *Pueblo v. Toro Martínez,* supra, págs. 857-858; *Pueblo v. García Colón I,* supra, pág. 165; *Pueblo v. Viruet Camacho,* 173 DPR 563, 584-585 (2008). Resulta importante destacar que "el testimonio de un testigo principal, por sí solo, de ser creído, es suficiente en derecho para sostener un fallo condenatorio". *Pueblo v. Toro Martínez,* supra, pág. 860.

Por último, luego que recae un veredicto de culpabilidad, permea una presunción de corrección sobre el dictamen.

### C. Admisibilidad de evidencia

El deber de salvaguardar el debido proceso de ley, consagrado en la Sección 7 del Artículo II de la Constitución de Puerto Rico, y en la Quinta y Decimocuarta Enmienda de la Constitución de Estados Unidos, se refiere al "derecho de toda persona a tener un proceso justo y con todas las garantías que ofrece la ley, tanto en el ámbito judicial como en el administrativo". *Marrero Caratini v. Rodríguez Rodríguez,* 138 DPR 215, 220 (1995).

Este derecho es binario, y en su vertiente procesal, el debido proceso de ley constituye una protección abarcadora en lo que respecta al procedimiento criminal. La misma protege a la persona imputada o acusada de delito, dándole "un arma ofensiva y defensiva; ***impide al Estado ciertos métodos de investigación y procesamiento, y también proporciona al acusado armas***

***ofensivas,*** como el derecho a cierto descubrimiento de prueba y a presentar cierta evidencia". Ernesto Luis Chiesa Aponte, II *Derecho Procesal Penal de Puerto Rico y Estados Unidos,* pág. 2 (1995). (Énfasis nuestro).

La Regla 109 de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 109, es uno de esos mecanismos procesales que pueden ser útiles durante el acto del juicio, ya que sirve para dilucidar o determinar la admisibilidad de evidencia. Dicha determinación sobre la admisibilidad de la prueba debe hacerse en términos ideales, antes de que se presente, para que no llegue a oídos del juzgador prueba que no cumple con los requisitos evidenciarios. R. Emmanuelli Jiménez, *Prontuario de Derecho Probatorio Puertorriqueño, Nuevas Reglas de Evidencia 2010,* 3ra. ed., Puerto Rico, Ediciones SITUM, 2010, pág. 413. La referida regla establece lo siguiente:

> (a) Admisibilidad en general. — Las cuestiones preliminares en relación con la capacidad de una persona para ser testigo, la existencia de un privilegio o la admisibilidad de evidencia serán determinadas por el tribunal salvo a lo dispuesto en el inciso (b) de esta regla. Al hacer tales determinaciones, el tribunal no queda obligado por las Reglas de Derecho Probatorio, excepto por aquellas relativas a privilegios.
> [...]

Como regla general, la prueba de referencia es inadmisible. La misma se reconoce por constituir una declaración –oral o escrita– hecha extrajudicialmente, presentada con la intención de probar la verdad de lo aseverado. Regla 801 de Evidencia, supra. La prueba de referencia es excluida por su falta de confiabilidad y por su dudoso valor probatorio. *In re Ríos Ríos*, 175 D.P.R. 57, 75 (2008).

Para evaluar la admisibilidad de la prueba de referencia, se deben considerar varios factores: (1) que no se lesione significativamente el derecho a confrontación de la parte contra la cual se admite la prueba de referencia; (2) el elemento de necesidad, en lo que respecta a que el declarante no está disponible para

testificar en el juicio o vista en que se ofrezca la prueba de referencia, y (3) las garantías circunstanciales de confiabilidad que pueda tener la declaración.  E.L. Chiesa, *Tratado de Derecho Probatorio*, Estados Unidos de Norte América, Publicaciones JTS, 2005, Tomo II, pág. 565.

### D. Efecto de las objeciones oportunas

La Regla 105 de las de Evidencia, supra, dispone sobre el efecto de los errores en la admisión o exclusión de prueba. La norma general establece que un error de esta índole no conllevará la revocación de la sentencia o decisión emitida, salvo que se cumplan dos requisitos esenciales: (1) que la parte adversamente afectada haya satisfecho los requisitos de objeción, fundamento u oferta de prueba, conforme lo exige la Regla 104; y (2) que el foro revisor concluya que la evidencia admitida o excluida constituyó un factor decisivo o sustancial en el resultado impugnado. *Íd.* Asimismo, cuando el error implique la violación de un derecho constitucional de la persona acusada, el Tribunal Apelativo sólo podrá confirmar la decisión si está convencido, más allá de duda razonable, de que el resultado hubiera sido el mismo aun sin la comisión del error. *Pueblo v. Santos Santos*, 185 DPR 709, 728-729 (2012).

En cuanto al primer requisito, la jurisprudencia ha reiterado la obligación de la parte objetante de dejar constancia suficiente en el récord de aquello que el testigo hubiera declarado, o de la prueba que se pretendía introducir, a fin de que el tribunal apelativo pueda evaluar el impacto de la exclusión o admisión errónea. *Pueblo v. López Rivera*, 102 DPR 359, 368 (1974). De ahí que la objeción oportuna y fundamentada sea un requisito indispensable para preservar el error en revisión. Véase E. L. Chiesa, Práctica Procesal Puertorriqueña – Evidencia, Publicaciones J.T.S., Inc., pág. 7, (1979).

Respecto al segundo requisito, nuestro más Alto Foro ha acogido la doctrina del error no perjudicial, o "harmless error" en inglés. Según ha expresado el Prof. Ernesto Chiesa, "el error en la admisión o exclusión de evidencia no acarrea revocación a menos que, mediando oportuna y correcta objeción, el tribunal apelativo estime que el error cometido fue factor decisivo o sustancial en la sentencia o decisión objeto de revisión". E. L. Chiesa, op cit. pág. 8. Véase, además, *Pueblo v Santiago Irizarry*, 198 DPR 35 (2017); *Pueblo v. Santos Santos*, supra; *Pueblo v. Martínez Solís*, 128 DPR 135, 162 (1991); *Pueblo v. Ruiz Bosch,* 127 DPR 762, 786-87 (1991). De manera que el análisis pertinente no descansa en la mera identificación del error, sino en determinar si este tuvo la capacidad de alterar el resultado final. *Pueblo v Santiago Irizarry*, supra; *Pueblo v. Mangual Hernández*, 111 DPR 136, 145 (1981).

De no objetarse oportunamente la admisión o exclusión de la prueba, se entiende que la parte renunció a su planteamiento y no podrá presentarlo en revisión. Como norma general, el apelante no puede levantar en apelación asuntos no planteados ante el Tribunal de Primera Instancia. *Pueblo v. Rivero, Lugo y Almodóvar*, 121 DPR 454, 476 (1988). En consecuencia, la doctrina del error perjudicial exige que el apelante demuestre que el resultado probablemente hubiera sido distinto de no haberse cometido el error. *Pueblo v Santiago Irizarry,* supra. Véase, además, E. L. Chiesa, op cit. pág. 8, (1979).

En síntesis, para que este Tribunal pueda acoger un señalamiento de error bajo la Regla 105 de Evidencia, supra, no basta con la identificación de la admisión o exclusión indebida; debe concurrir una objeción oportuna y fundamentada, así como la demostración de que el error constituyó un factor sustancial o decisivo en el resultado. Ello responde a la máxima de que el debido

proceso de ley no garantiza un juicio perfecto, sino un juicio justo. *Pueblo v. Echevarría Rodríguez I,* 128 DPR 299, 381 (1991).

**III.**

El aquí apelante sostiene que el TPI-Bayamón erró en su apreciación de la prueba al encontrarlo culpable de los delitos imputados. Aduce que no se cumplió con el estándar probatorio para su convicción, por lo que se violentó el debido proceso de ley. Arguye, además, que se equivocó el Foro Apelado al impedirle a su representación legal preguntarle a una de las testigos de cargo sobre el contenido de un *Exhibit* admitido como evidencia. Es su contención que esto, de igual forma, laceró sus derechos constitucionales. Adelantamos que a Galay Sierra *no le asiste la razón.*

En su *primer señalamiento de error,* Galay Sierra aduce que no se estableció su culpabilidad más allá de duda razonable. Luego de evaluar los autos originales del caso de epígrafe, haber leído la transcripción oral de los procesos y evaluados los escritos de ambas partes, este Tribunal coincide con las expresiones del Magistrado en el Foro Primario durante el último día de juicio, previo a esbozar su fallo. Este reflexionó que la evidencia desfilada fue "abrumadora". A esos efectos, esbozó lo siguiente:

> JUEZ: Al final, aquí ha habido mucha evidencia sometida, alguna por estipulación, alguna en controversia, pero son oportunamente veintisiete exhibit, muchos de ellos con varias fotografías o con varios (ININTELIGIBLE) y cuando vemos lo que es evaluación y suficiencia de la prueba, y cuando lo único que tengo que remirar, es precisamente ese caso sobre alguna inconsistencia en el testimonio, pero el resto de la prueba es tan abrumadora, sobre todo científica. Que lo que hace es corroborar testimonio. El tribunal no tiene duda, si tiene duda razonable, de que efectivamente el señor Luis Alfredo Galay Sierra cometió el delito de Artículo 6.05 de la Ley de Armas, Artículo 6.14 de la Ley 168 y el

Artículo 93A del Código Penal, por lo que lo encontramos culpable de todos y cada uno de los delitos.[132]

En efecto, es nuestra apreciación que la prueba de cargo demostró más allá de duda razonable, que Galay Sierra cometió los delitos que se le imputaron. Veamos.

Los testimonios de los agentes Santiago Morales, Molina Fred y Burgado Cortés establecieron el trabajo realizado en la escena, en donde se recopiló la evidencia física utilizada en el juicio. Estos agentes recopilaron la evidencia balística que evaluó el Agente Fonseca García. Este último también testificó e identificó científicamente la compatibilidad de los casquillos de bala recopilados en la escena y las armas que las dispararon.

Los agentes previamente mencionados, de igual forma, identificaron y entrevistaron a la testigo ocular del caso, Desirée Gutiérrez, quien era la actual pareja de la víctima y la ex pareja del apelante. Mediante el testimonio de ella, y la prueba digital facilitada a través de su teléfono, no solo se ubicó a Galay Sierra en el lugar de los hechos, sino, además, se ilustró la motivación y oportunidad que este tuvo para cometer los delitos en cuestión.

Como parte del testimonio vertido y creído por el TPI-Bayamón, Desirée Gutiérrez expresó que, el día antes de los hechos, esta estuvo en comunicación con Galay Sierra, quien le propinó una amenaza:

> TESTIGO: Él me comunicó que si me veía en la caravana con Carlos, que él no tenía ningún tipo de problema conmigo, pero que con Carlos sí, y se iba a formar un revolú.[133]

Además, testificó que el apelante le escribió mediante la plataforma digital de *Instagram*, posterior a los hechos, y le pidió

---

[132] Transcripción de la prueba oral, págs. 830-831.
[133] *Íd.*, pág. 611.

perdón por lo sucedido. A esos efectos, el testimonio vertido fue el siguiente:

> TESTIGO: Bueno, sí él estuvo en contacto conmigo para dejarnos saber en qué status estaba todo.
>
> MINISTERIO PÚBLICO: Y le pregunto, luego de ese día, (ININTELIGIBLE) a Luis (ININTELIGIBLE)
>
> TESTIGO: Sí, él me escribió un mensaje a través de Instagram.
>
> MINISTERIO PÚBLICO: Cuando usted dice él me escribió un mensaje a través de Instagram, le pregunto cómo usted sabe que era él.
>
> TESTIGO: Bueno, porque su nombre de usuario era el mismo de siempre.
>
> MINISTERIO PÚBLICO: ¿Qué es cuál?
>
> TESTIGO: Si no me equivoco era W_87.
>
> MINISTERIO PÚBLICO: Y le pregunto ese mensaje o si se acuerda, ¿qué fecha tenía?
>
> TESTIGO: No sé si habían pasado dos o tres días de lo que había pasado. Fue del 27 al 29.
>
> MINISTERIO PÚBLICO: (ININTELIGIBLE)
>
> TESTIGO: Desde el accidente con Carlos.
>
> MINISTERIO PÚBLICO: Y cuando usted nos dice que lo escribió por Instagram, ese mensaje a dónde usted lo recibió.
>
> TESTIGO: A mi teléfono.
>
> MINISTERIO PÚBLICO: A su teléfono. ¿Y qué decía ese mensaje?
>
> TESTIGO: Realmente el mensaje es un poco largo. Lo poco que me puedo acordar es que decía que lo perdonáramos, que nos iba a amar siempre; eso fue lo básicamente decía.[134]

Es importante destacar que este testimonio fue corroborado por el Agente Molina Fred, quien la entrevistó, y quien la dirigió en el proceso para extraer la prueba de su teléfono celular.

Por otro lado, las investigaciones de los agentes del caso, en colaboración con Desirée Gutiérrez los dirigió hacia las imágenes captadas por el Supermercado Agranel de Dorado. El testimonio del Agente Molina Fred, quien observó los videos con Desirée Gutiérrez,

---

[134] Transcripción de la prueba oral, págs. 681-682.

recoge el momento en el que Galay Sierra abre fuego contra Colón Morales. La testigo lo identifica mediante la vestimenta y el arma de fuego que utilizó, con la que estaba familiarizada.

Finalmente, el Foro Primario contó con el testimonio de la Patóloga Forense, la Dra. Paola Luna. Esta fue la que realizó la autopsia del occiso, y quien, mediante la prueba adjudicada y creída por el TPI-Bayamón del Informe Médico Forense, concluyó que la muerte de Colón Morales respondió a cuatro (4) impactos de bala en distintas partes del cuerpo. La prueba física y testimonial demostró, más allá de toda duda razonable, que esas heridas las propició el apelante utilizando el arma de fuego.

En síntesis, los testimonios de los agentes de la policía, del ICF e Iván Vázquez, corroboraron en múltiples ocasiones el testimonio de la testigo ocular de los hechos, Desirée Gutiérrez.

Como vimos, solo cuando medien dudas razonables y fundadas sobre la culpabilidad de un apelante, puede esta Curia intervenir en la apreciación del juzgador de los hechos. Evaluada la prueba en su totalidad, y los testimonios vertidos en el juicio, *concluimos que la determinación del Foro Primario no adolece de este tipo de dudas, ni hemos observado prejuicio o error manifiesto en la conducción de los procesos*. Por el contrario, entendemos que las determinaciones del TPI-Bayamón se sustentan cabalmente con el récord.

En su *segundo señalamiento de error*, Galay Sierra argumenta que el Foro Apelado erró al no permitirle a su representación legal hacerle una serie de preguntas a Desirée Gutiérrez. Según recogimos en el resumen de los testimonios, la testigo autorizó a la Policía de Puerto Rico a extraer el contenido de su teléfono celular por unas comunicaciones del apelante. Ese contenido se encontraba grabado en un disco, que eventualmente se convirtió en el *Exhibit* número nueve (9), debidamente admitido como evidencia por el TPI-

Bayamón.[135] Durante el directo de Desirée Gutiérrez, el Ministerio Público le preguntó sobre expresiones escritas dirigidas a ella por parte del apelante. Sobre estas expresiones, la representación legal de Galay Sierra tuvo la oportunidad de confrontarla.

Sin embargo, durante el contrainterrogatorio de la testigo en cuestión, la defensa intentó preguntarle sobre unos mensajes que esta había recibido *por otro individuo no identificado*. El Ministerio Público objetó oportunamente por entender que ese contenido era prueba de referencia. Por su parte, la defensa adujo que el disco en donde estaban estas expresiones había sido admitido como evidencia. A su vez, el TPI-Bayamón sostuvo la objeción, por entender que esa parte del contenido era prueba de referencia.

Según reseñamos previamente, la admisibilidad de una prueba no subsana las restricciones estatutarias, como la prueba de referencia. Por el contrario, la admisibilidad de una prueba está sujeta a que no se configure una prohibición. Y como regla general, la prueba de referencia es inadmisible. Las Reglas de Evidencia, *supra*, y nuestra jurisprudencia ha establecido una serie de excepciones para la admisión de prueba de referencia.

Si bien es cierto que el *Exhibit* número nueve (9) contenía ambas comunicaciones, tanto las de Galay Sierra, como las del *individuo no identificado*, por instrucciones del Foro Primario, el Ministerio Público identificó – para fines de autenticación – las capturas de pantalla. A esos efectos, la instrucción del Magistrado fue la siguiente:

> JUEZ: Por eso, pero pienso, verdad, para fines de que surja claramente del récord porque puede ser que hayan algunas ya con una contestación que ella acaba de dar, hay unas cosas que pudieran ser admisibles, otras no, no sé. Vaya uno

---

[135] Transcripción de la prueba oral, pág. 696.

a uno y que ella le vaya identificando. Haciendo referencia quizás los últimos cuatro dígitos de cada imagen.[136]

Posterior a esta instrucción, el Ministerio Público procedió con el proceso de autenticar, uno a uno, el contenido del teléfono de Desirée Gutiérrez.[137] Luego, sin objeciones de la defensa, el TPI-Bayamón admitió como evidencia el *Exhibit* número nueve (9). No obstante, durante el directo a Desirée Gutiérrez, el Ministerio Público no preguntó ni entró en el contenido de todas las imágenes y videos del *Exhibit* nueve (9). En síntesis, se limitó a preguntarle a la testigo sobre su registro de llamadas y unos mensajes recibidos por el apelante.

Por su parte, durante el contrainterrogatorio, la defensa intentó cuestionarle a la testigo sobre unos mensajes anónimos que recibió. Los mismos fueron recogidos en una de las capturas de pantalla del *Exhibit* nueve (9). Sin embargo, surge que estos mensajes, aunque fueron autenticados y admitidos, su contenido no formó parte del directo. Por ello, el Ministerio Público se opuso. La argumentación a estos efectos fue la siguiente:

> MINISTERIO PÚBLICO: Está bien. Pero (ININTELIGIBLE). Mi objeción va en cuanto al contenido de esas expresiones (ININTELIGIBLE). Que uno, no se identifica la acción de la expresión. Y, dos, la compañera lo trae para probar la verdadera (ININTELIGIBLE). Así las cosas, porque hay referencia. No hay percepción que yo conozca hasta ahora que si la prueba (ININTELIGIBLE) alguna regla del ministerio público. El ministerio público no (ININTELIGIBLE). Eso no existe. Las excepciones están en la propia regla, la 65.
>
> JUEZ: Lo que pasa es que lo que no entiendo cuál es el propósito entonces de pedirle al tribunal que se marque como exhibit una pieza, porque una vez se marca como exhibit, claro, el proceso es el que usted bien ha dicho, es autenticar. Pero si se solicitó, ¿lo están retirando ahora?
>
> MINISTERIO PÚBLICO: No, Juez. Porque lo que estábamos hablando era de la autenticidad del mismo. En cuanto a eso

---

[136] Transcripción de la prueba oral, págs. 687-688.
[137] *Íd.*, págs. 688-696.

fue. Porque si se fija no se trata de fotos aparte. Se trata de un disco completo. Que ya ese proceso se (ININTELIGIBLE).

[...]

JUEZ: Espérese, espérese, déjeme. Porque quiero saber, quiero que me responda el ministerio público si algo se solicita al tribunal que se marque como exhibit es con la intención de que el tribunal, bueno de que el testigo pueda ir sobre eso. Y que el tribunal en su día esa pieza de evidencia la examine y le dé el valor probatorio que entienda que se debe dar. Eso se solicitó por el ministerio público porque se solicitó que se marcara. Y así se hizo. Y no se hizo excepción de la 34221.

MINISTERIO PÚBLICO: No, el número 3316. Y, específicamente, se pasó el proceso de identificación, no la autenticación toda vez que la misma testigo indicó que no conocía de quién era esa puerta. Que ella desconoce de quién era esa puerta. A raíz de eso, eso se autenticó con (ININTELIGIBLE)

[...]

JUEZ: Okay. Y ese 2316 tengo aquí en mis notas que también se pasó por el proceso de autenticación. Incluso el tribunal escribió "okay" para autenticar porque pensé que iban a venir otras objeciones. Luego la defensa manifestó que no tenía reparo a que se marcara completo.

[...]

DEFENSA: Quien está objetando ahora es él. Y está objetando el contenido del CD que él le solicitó a su honorable que se marcara.

MINISTERIO PÚBLICO: (ININTELIGIBLE) que no podíamos interrumpir y la compañera me interrumpió.

DEFENSA: Lo que pasa es que, con mucho respeto, es que yo tengo que objetar que está hablando lo que no es.

JUEZ: Pero en su momento. Termine fiscal.

MINISTERIO PÚBLICO: ...el momento específico. Ahora, como las objeciones tienen que ser oportunas. Cuando surge el asunto del (ININTELIGIBLE) que el ministerio público lo objeta oportunamente por el fundamento correcto.

JUEZ: O sea, que usted está objetando... Ustedes lo que me están diciendo es que la petición de que se marcara como exhibit era para fines de autenticidad del documento completo porque es un documento que tiene varias extracciones. Y de esas extracciones entiende que hay unas extracciones que, a pesar de, ser auténticas no son admisibles porque constituyen, en este caso

específicamente, prueba de referencia. Con relación a que si eso es prueba de referencia o no, licenciada.

DEFENSA: Bueno, honorable Juez, lo que pasa es que esto es una conversación que ella tuvo con esa persona.

MINISTERIO PUBLICO: No, que ella recibió.

JUEZ: Espérese, espérese.

MINISTERIO PUBLICO: Ella recibió.

DEFENSA: No, la evidencia (ININTELIGIBLE). La evidencia quien la probó fue este ministerio. Y es (ININTELIGIBLE). Las reglas permiten, incluso, yo pudiera no hacerle preguntas, enseñarle el exhibit y decirle léelo. Eso está permitido por las reglas. O pedirle...

JUEZ: Lo que pasa es que ahora, pero ahora hay otra petición al ministerio público y es que eso no se tenga como admitido para propósitos del contenido, porque entienden que es prueba de referencia. Pero igual, usted puede impugnar un testigo con manifestaciones de ella, por eso, pero no con prueba de referencia. Así que haga las preguntas. En este momento no lo estoy admitiendo. Sí puede hacer preguntas relacionadas al tema. Y ella puede decirle si es cierto o no es cierto. Pero ir entonces al contenido de algo que haya dicho un tercero, que ni siquiera sabemos quién es, pues entonces ciertamente es prueba de referencia.[138]

Así las cosas, la defensa del apelante continuó el contrainterrogatorio a Desirée Gutiérrez, observando la decisión del TPI-Bayamón. Por ello, no pudo entrar en el contenido de las capturas de pantalla del *Exhibit* número nueve (9) que el Foro Primario catalogó como prueba de referencia.

Ahora bien, la representación legal de Galay Sierra no estaba desprovista de remedio. Como vimos, nuestro estado de derecho requiere que, cuando el Tribunal se niegue a recibir o escuchar evidencia que una parte entienda necesaria, pertinente, exculpatoria, entre otros, deberá realizar una oferta de prueba. De esta manera, el Foro Apelativo que revise el dictamen podrá pasar juicio de la determinación del Foro Primario, con relación a esa

---

[138] Transcripción de la prueba oral, págs. 708-713.

evidencia. En el caso de marras, eso no pasó. Vedados de considerar dicha prueba, el apelante no nos ha colocado en posición de evaluar si, en efecto, el TPI-Bayamón erró al negar el desfile de la misma.

**IV.**

Por los fundamentos antes expuestos, *confirmamos la "Sentencia" apelada en su totalidad.*

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones